UNITED STATES DISTRICT COURT

DISTRICT OF IDAHO

| | |
|---|---|
| TONY BRUDERER, et al.,<br><br>　　Plaintiffs,<br><br>　vs.<br><br>PACIFICORP, an Oregon corporation doing business as UTAH POWER,<br><br>　　Defendant. | NO. CV-06-0271-E-JLQ<br><br>MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

　　BEFORE THE COURT is Defendant's Motion for Summary Judgment (Ct. Rec. 34). Telephonic argument was heard on June 4, 2007.  **Kelly Kumm** appeared for the Parsons Plaintiffs.  Plaintiff Tony Bruderer was represented by **Brent O. Roche**. Defendant PacifiCorp was represented by **Joel E. Tingey**.  The court has been advised that the Parsons Plaintiffs' claims have been settled, however, the court has not ruled thereon as to the reasonableness of the minors' proposed settlement.

## INTRODUCTION

　　This action is brought against PacifiCorp, an Oregon corporation doing business as Utah Power & Light, to recover for the Defendant's alleged acts of negligence leading to an accident on the morning of December 29, 2004, involving a high voltage overhead power line that resulted in the death of Robert Parsons ("Parsons") and serious injuries to Tony Bruderer ("Bruderer").  At the time of his death, Parsons was a resident of

ORDER - 1

Pocatello, Idaho, and is survived by Jodi Parsons, mother and legal guardian of three of his minor children, S.P., B.E.P., and A.P.; Gina Ward, mother and legal guardian of P.P., another minor child of Parsons, and; Elliot and Kathy Parsons, his parents and the personal representatives of his estate. Likewise, Burderer is a resident of Pocatello, Idaho. Diversity of citizenship jurisdiction exists.

Defendant's Motion For Summary Judgment seeks an order dismissing this action in it entirety. In the alternative, Defendant seeks an order dismissing Plaintiffs' claim of joint and several liability between PacifiCorp and Qwest Communications Corporation ("Qwest"), or assuming PacifiCorp and Qwest acted in concert, Defendant seeks an order finding that PacifiCorp is entitled to immunity under the exclusive remedy provision contained in Idaho's Workers' Compensation Statutes. Bruderer objects to Defendant's motion in its entirety and his response is joined by the Parsons Plaintiffs.

## BACKGROUND

As this is Defendant's motion, the evidence and inferences arising therefrom are viewed in the light most favorable to the Plaintiffs. The facts are undisputed except where otherwise stated.

On the date of the accident, Bruderer and Parsons were employees of Orius Telecommunication Services, Inc. ("Orius"), a utility contractor for Qwest, the owner of the telephone lines in question, and were working on a house-moving project in conjunction with Parrish Movers, a house-moving company; Cable One, a cable company; and the local power company, Utah Power & Light, a subsidiary of Defendant PacifiCorp. It is unclear, based upon the record before the court on summary judgment, how the house-moving project was initiated or coordinated. Apparently, there was no oral or written agreement between PacifiCorp and Qwest or Orius, (Dft. Exhibit C), and Bruderer, as Orius' crew leader for the project, never discussed the house-moving project with anyone from Utah Power & Light. (Bruderer Dep. pg. 161, 181). Furthermore, no one from Utah Power & Light spoke with anyone from Orius concerning the project.

ORDER - 2

(Dft. St. Fact ¶ 23).

Despite the apparent lack of communication, all the parties participating in the house-moving project – Parrish Movers, Cable One, Utah Power & Light, and Orius – knew to meet for the house move on the morning of December 29, 2004; knew the house-moving route; and knew how to proceed with their various duties. For instance, Randy Kidman, foreman for the Utah Power & Light crew, understood that the Orius crew would be temporarily detaching telephone lines crossing over the roadway along the house-moving route. (Kidman Dep. pg. 70-71). Also, according to Bruderer's Statement of Facts, yet without any citation to supporting evidence, "Defendant had been provided with a document disclosing the planned route in advance of the project" and "Defendant's troubleshooters would have inspected the route looking for hazards and determining the necessary manpower for the project." (Pltf. St. Fact ¶ 7).

On the morning of the accident, the Orius crew, including Bruderer and Parsons, was the last to arrive at the job site and everyone began working immediately thereafter. (Kidman Dep. pg. 69-71). The Orius crew's first stop was Defendant's guy pole number 029909 ("accident pole") situated near the southwest corner of the intersection of 4900 North and 4500 East, north of Idaho Falls in Bonneville County, Idaho. (Bruderer Dep. pg. 183).[1] At the accident pole, no one from Orius made any clearance measurements. Instead, based upon a visual inspection of the site and watching Parsons work from the basket of their bucket truck, Bruderer believed they would not be encroaching upon the 24-inch personal clearance requirement and could maintain forty (40) inches between the

---

[1] At this deposition, Bruderer stated that, in retrospect, the same phone lines could have been dropped using a transmission pole across the street that would have offered greater clearance between the power lines and the telephone lines. (Bruderer Dep. pg. 217-18). While the bucket truck could not have been used at that location because it would have blocked traffic, for which there was no permit, the same work could have been accomplished by climbing the pole. (*Id.* at 218-20).

ORDER - 3

power lines and their truck's basket. (*Id.* at 212-13, 215-17, 240). Parsons went up in the truck's basket several times to identify and mark the telephone lines prior to removal without incident. However, when Parsons went up to actually disconnect the telephone lines, he came into contact with a power line belonging to Utah Power & Light and was electrocuted. (*Id.* at 237).

Bruderer does not recall all of the circumstances surrounding his own injury. He only remembers that he was on the ground getting his tools together and putting on his climbing gear when Parsons came into contact with the power line. (Dft. St. Fact ¶ 31). It is claimed, however, that Bruderer was electrocuted when he attempted to rescue Parsons by jumping onto the truck to lower the basket. (*Id.*). After the accident, Parsons and Bruderer were treated by emergency personnel and transported to Eastern Idaho Regional Medical Center. (*Id.*). Tragically, Parsons died as a result of his injuries and Bruderer suffered extensive electrical burns that required numerous surgeries and treatment at the Burn Unit at the University of Utah Hospital. (*Id.*).

On the date of the accident, Bruderer was working for Orius as an aerial supervisor with responsibilities that included the aerial installation of coaxial cable, the aerial and underground placement of fiberoptic cable, the aerial placement of telephone lines, the placement of underground conduit, and the maintenance, new placement, and removal of lead cable. (Bruderer Dep. pg. 98, 119). Throughout his career, Bruderer had received safety training, although much of it occurred in Odessa and Corpus Christi, Texas, prior to moving to Idaho. (*Id.* at 66). Bruderer was trained to maintain a minimum distance of forty (40) inches between power lines and new attachments and a minimum distance of twelve (12) inches between new and existing communication lines, pursuant to the National Electric Safety Code ("NESC") regulations. (*Id.* at 62-63, 82-83, 85-86). Further, Bruderer was trained to assume that every power line was energized and to maintain a personal distance of at least twenty-four (24) inches from power lines. (*Id.* at 51). Also, he believed he should maintain a 40-inch minimum

ORDER - 4

distance between power lines and any equipment, such as the basket on a bucket truck. (*Id.* at 85-86, 108). Finally, if confronted with a situation that would require working within these distance requirements, a problem with a power line, or a pole with insufficient clearance between lines, Bruderer was trained to stop work, secure the site, notify his immediate supervisor, and then notify the power company and wait until the power company remedied the situation. (*Id.* at 55, 85, 89, 103).

While Bruderer never received any training with regard to operating a bucket truck around power lines, he was trained in the emergency procedures to follow if the basket or a lineman in the basket ever came into contact with a power line. (*Id*. at 71-72, 118). He was taught he could avoid being electrocuted by jumping onto the truck, (*Id*. at 105-109, 118-119), where the emergency manual override and controls could be used to lower the truck's basket. (*Id*. at 108-09, 118-19, 227-29). At the same time, Bruderer knew the risks of being electrocuted if the truck became energized and was familiar with the truck's numerous decals warning of electrocution. (*Id*. at 229, 234-35).

Defendant repeatedly asserts that Qwest attached its telephone lines to the accident pole without Defendant's permission. In the Defendant's original response to an interrogatory, however, Defendant stated that "Defendant does not know if said attachments were done with Defendant's permission or not. After performing a diligent search, Defendant cannot locate any information and/or documentation concerning said attachments. If any information and/or documentation is located it will be supplemented at a later date." (Pltf. St. Fact ¶ 5). Later, after seeing Bruderer's response to this motion, Defendant updated its answer with the affidavit of Laura Raypush, supervisor of Contract Administration for PacifiCorp. In her affidavit, Mrs. Raypush states that a search and review of PacifiCorp's JTU database, which holds records relating to applications by companies seeking permission to attach their equipment to PacifiCorp's utility poles, revealed no applications from any company to attach equipment to the accident pole. (Raypush Affidavit ¶¶ 2-3).

ORDER - 5

Defendant also points to a May 1998 pole-sharing agreement, in which the parties, or the entities they succeeded, entered into entitled "General Agreement for Joint Use of Facilities Between PacifiCorp, doing business as Pacific Power and Utah Power, and US West Communications, Inc." (Dft. St. Fact ¶¶ 2-3). The agreement states that:

> Whenever either party desires to place its Equipment on any pole owned by the other Party, it shall make written application therefor, specifying the Equipment, the map number, both party's pole numbers, and street address of the poles in question and the space desired on each pole. Said application shall be made on a form acceptable to both Parties and shall be directed to the Owner at the address specified in Article XXII of this Agreement. If the application is approved, the Owner shall, within thirty (30) days after receipt of the application, sign and return a copy of the application to the Applicant. If the application is rejected, the Owner shall, within said thirty (30) day period, provide written notice of the rejection to Applicant specifying the reasons for denial and providing any available supporting documentation and Applicant shall remove any equipment that may have been placed on the Owner's pole.

(Dft. Exhibit A, ¶ 3.1). However, nothing in the pole-sharing Agreement states that it should be applied retroactively. In fact, the Agreement states that "[e]quipment currently attached to poles in accordance with approval granted by the Owner under prior agreements and applications in progress for permits, shall continue in effect under the terms and conditions of this Agreement," (Dft. Exhibit A, ¶ 14.1), and according to David Pierce's expert report "the date on which the telephone lines were attached to Pacificorp's pole #029909 is unknown," however, "[g]iven the apparent age of the houses at the intersection, it appears that the telephone lines have been attached to the pole since at least the mid 1970's when Utah Power improved its transmission and distribution system in the area." (Ct. Rec. 40-3, pg. 3). Although Bruderer has suggested that the telephone lines may have been attached pursuant to a 1970's pole sharing agreement, neither Plaintiff nor Defendant has produced an agreement from that period. (Pltf. St. Fact ¶ 4).

ORDER - 6

It is disputed whether Defendant violated the NESC regulations with respect to the clearance between its power line and the telephone lines attached to the accident pole. It is the opinion of Defendant's expert, John Dagenhart, that no violation existed. (Ct. Rec. 36, ¶ 4). Conversely, Bruderer's liability expert, David Pierce, has submitted an affidavit expressing his opinion that Defendant violated the clearance provisions of the 1973 edition of the NESC regulations, stating as follows:

> The telephone lines attached to the accident pole, which was installed in 1936, were essentially the same height as Defendant's distribution lines. The phase distribution line accidently contacted by Mr. Parsons was 3 and 1/2 feet north of the accident pole. As explained in my report, the 1973 edition of the NESC required 6 feet of clearance. Defendant violated this clearance provision when it installed it upgraded transmission and distribution lines in about 1975. Defendant allowed the dangerous condition to remain for 29 years until the accident occurred.

(Pltf. St. Fact ¶ 1; Pierce Affidavit ¶ 3).

It is undisputed that after investigating the accident, OSHA issued Orius two citations for eight safety violations. (Dft. St. Fact ¶ 32). Thereafter, Orius entered into a Informal Settlement Agreement with OSHA, wherein Orius agreed to correct the conditions described in the citations and pay the proposed penalties. (Roche Affidavit, Exhibit 4). It should be noted, however, that the settlement states that "[b]y entering into this agreement, [Orius] does not admit that it violated the cited standards for any litigation or purpose other than a subsequent proceeding under the Occupation Safety and Health Act." (*Id*. at ¶ 13).

## SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the material facts before the court. *Northwest Motorcycle Ass'n v. United States Dept. of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). The moving party is entitled to summary judgment when, viewing the evidence and the inferences arising therefrom

in the light most favorable to the nonmoving party, there are no genuine issues of material fact in dispute. FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). While the moving party does not have to disprove matters on which the opponent will bear the burden of proof at trial, they nonetheless bear the burden of producing evidence that negates an essential element of the opposing party's claim and the ultimate burden of persuading the court that there is no genuine issue of material fact. *Nissan Fire & Marine Ins. Co. v. Fritz Companies*, 210 F.3d 1099, 1102 (9th Cir. 2000).

Once the moving party has carried its burden, the opponent must do more than simply show there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1975). In meeting this burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." *Miller v. Glenn Miller Productions*, 454 F.3d 975, 987 (9th Cir. 2006) (quoting FED. R. CIV. P. 56(e)).

## ANALYSIS

**I. Intervening, Superseding Causes:**

Defendant argues that its liability is precluded by the following intervening, superseding causes: (1) Qwest and/or Orious unforeseeably attaching and/or maintaining telephone lines in close proximity to power lines on Defendant's utility pole without permission, and (2) Bruderer and Parsons unforeseeably acting "recklessly in close proximity to power lines" by taking no safety precautions, contrary to their training.

In *Mico Mobile Sales & Leasing, Inc. v. Skyline Corp.*, 97 Idaho 408, 411, 546 P.2d 54, 57 (1975), the Idaho State Supreme Court adopted the definition of superseding cause from the Restatement (Second) of Torts § 440 (1965). According to the court, "[a] superseding cause is an act of a third person or other force which by its intervention

prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about." *Id.* at 411-12 (quoting *Lundy v. Hazen*, 90 Idaho 323, 329, 411 P.2d 768, 771 (1966)). Restatement (Second) of Torts § 442 (1965) provides the following guidelines for determining whether an intervening act was a superseding cause of harm to another:

> (a) the fact that its intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence;
> (b) the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation;
> (c) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation;
> (d) the fact that the operation of the intervening force is due to a third person's act or to his failure to act;
> (e) the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him;
> (f) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion.

"Ordinarily, the question of foreseeability is a question of fact. However, when the undisputed facts can lead to only one reasonable conclusion, this court may rule upon the issue of foreseeability as a matter of law." *Id.* (internal citations omitted).

Despite *Mico Mobile's* adoption and application of the Restatement (Second) of Torts's definition of superseding cause, the Idaho State Supreme Court subsequently upheld district court decisions that the intervening acts of third parties, in combination with a plaintiff acts, constituted superseding causes, thereby relieving the defendants of any liability. *See Obray v. Glick*, 104 Idaho 432, 434, 660 P.2d 44, 46 (1982) (holding that plaintiff's act – walking into a lane of traffic without looking for oncoming automobiles and spending 10 to 20 seconds to upright a traffic reflector – combined with

ORDER - 9

a third-party motorist's act – driving on an unobstructed roadway and failing to see the plaintiff standing in the roadway – constituted an intervening superseding cause of the ensuing accident relieving the defendant police officer of any liability for instructing the plaintiff to keep the reflector upright until a tow-truck arrived for the plaintiff's truck); *see also LaChance v. Poss Machine & Mill Supply, Inc.*, 102 Idaho 505, 507, 633 P.2d 570, 572 (1981) (discussing how the intervening acts of unknown third party co-workers, along with plaintiff's actions, were unforeseeable as a matter of law and constituted a superseding cause of plaintiff's injuries).

However, the Idaho State Supreme Court later returned to the definition of superseding cause adopted in *Mico Mobile*. *See Brooks v. Logan*, 127 Idaho 484, 491, 903 P.2d 73, 80 (1995) *superseded by statute on other grounds* (recognizing that the court's previous holdings require "an act by a third person or other force in order to establish an intervening, superseding cause"). Thus, Bruderer and Parsons cannot be "a third person or other force" leading to their own injuries and death, and their actions are more appropriately analyzed under Idaho's comparative negligence rubric. *See Id.* at 491-92 (stating that a student's act of taking his own life is more appropriately evaluated under the doctrine of comparative negligence, where the student's family brought an action for wrongful death and negligent infliction of emotional distress against the school district and the student's teacher who had read the student's troubled journal entries). The issue of comparative negligence is one for the jury and not a determination to be made at summary judgment. *Id.* at 492.

Regardless of whether Bruderer's and Parsons' actions are reviewed under the principles of comparative fault, or under the principles of intervening, superseding causes, along with the acts of Qwest, an undisputed third-party, the court cannot determine that any of these acts were unforeseeable as a matter of law. Laura Raypush's affidavit, which Defendant relies upon, states that a search of PacifiCorp's JTU database did not reveal any record of any company submitting an application to attach to the

ORDER - 10

accident pole. However, Raypush's affidavit is not dispositive on the issue of whether Qwest permissibly attached it's telephone lines, nor whether PacifiCorp actually knew that telephone lines were attached to its pole. As Bruderer points out, Raypush's affidavit does not state how much historical data is included in PacifiCorp's JTU database, such as whether it includes data prior to 2001, when PacifiCorp first started numbering its poles, or prior to 1990, when PacifiCorp acquired Utah Power & Light, (Pltf. St. Fact ¶ 6; Phillips Dep. pg. 8, 35), and, according to Plaintiff's expert, the telephone lines were likely attached sometime in the early 1970's.

Furthermore, Utah Power & Light employees appear to have actually seen Qwest's telephone lines attached to the accident pole on several occasions. Randy Kidman, Utah Power & Light's foreman, inspected the accident pole in May 2001, (Kidman Dep. pg 41-43), and fellow Utah Power & Light employee Jason Erickson inspected it again in November 2004. (Erickson Dep. pg. 44). Presumably, both employees saw Qwest's telephone lines during those inspections. Moreover, to accomplish the house-moving project, the Utah Power & Light crew understood that the Orius crew would be detaching and reattaching telephone lines along the house's path. Accordingly, while PacifiCorp may not be able to locate a written application from Qwest, it appears that PacifiCorp actually knew the phone lines were attached to the accident pole and knew that Orius' crew would be detaching and reattaching those lines on the morning of the accident. Therefore, the actions of Qwest and/or Orius were not obviously unforeseeable and Bruderer's and Parsons' actions should be evaluated under comparative negligence.

## II. IDAHO CODE § 55-2401 ET SEQ.

Defendant argues that Orius, Bruderer, and Parsons violated Idaho's Activities in Proximity to High Voltage Overhead Lines Act ("Act"), I.C. § 55-2401 et seq., and therefor Plaintiffs' actions are barred as a matter of law because Plaintiffs must indemnify Defendant for all damages which may be assessed against the Defendant,

ORDER - 11

including Plaintiffs' own injuries. Unfortunately, the only case cited by the parties or found by the court interpreting Idaho's Act is *Kunz v. Lamar Corp.*, 385 F.3d 1177 (9th Cir. 2004), and it does not address the issues raised herein. Thus, the court must rely upon principles of statutory interpretation.

When interpreting statutes, the court's objective is to give effect to the legislature's intent, which begins with the literal language of the statute. *Robinson v. Bateman-Hall*, 139 Idaho 207, 210, 76 P.3d 951, 954 (2003). In determining a statute's meaning, the court must apply "the plain and ordinary meaning of the terms and, where possible, every word, clause and sentence should be given effect. *Id.* Where the language of a statute is plain and unambiguous, the court must give effect to the statute as written, without engaging in statutory construction, *State v. Rhode*, 133 Idaho 459, 462, 988 P.2d 685, 688 (1999), unless the clearly expressed legislative intent is contrary or if following the plain meaning leads to absurd results. *Gillihan v. Gump*, 140 Idaho 264, 266, 92 P.3d 514, 516 (2004).

The statute is ambiguous if the language is capable of more than one reasonable construction. *Carrier v. Lake Pend Oreille Sch. Dist. No. 84*, 142 Idaho 804, 807, 134 P.3d 655, 658 (2006). An ambiguous statute must be construed to mean what the legislature intended it to mean. *Id.* To ascertain legislative intent, the Court examines not only the literal words of the statute, but the reasonableness of the proposed interpretations, the policy behind the statute, and its legislative history. *Id.*

Among the stated reasons, the Idaho State Legislature passed the Act "to prohibit activities in proximity to high voltage overhead lines except within specified clearances; to provide for arrangements with public utilities for the performance of activities in closer proximity than the specified clearance; [and] to provide penalties and payment of damages for violations of the provisions of the chapter; and to provide exemptions." Activities in Proximity to High Voltage Overhead Lines, 1992 Idaho Laws Ch. 177. Under the Act's safety restrictions, "a contractor, individually or through an agent or

ORDER - 12

employee or as an agent or employee," must maintain at least "ten (10) feet of clearance" around high voltage lines. I.C. § 55-2402(1). A "contractor" is defined as "any person . . . corporation, or other business doing business in the state of Idaho which contracts, subcontracts or otherwise agrees or undertakes to perform any function or activity upon any land . . ," I.C. § 55-2401(2), with a "person" defined as "any individual or business entity of any kind." I.C. § 55-2401(5). If a contractor wishes to perform any "function, activity, work or operation" within the ten (10) foot restricted zone, "the contractor responsible for performing the work shall promptly notify the public utility owning or operating the high voltage overhead line in writing. The contractor may perform the work only after making mutually agreeable arrangements with the public utility owning or operating the line, including coordination of work and construction schedules . . ." I.C. § 55-2403(1).

> The provisions of this chapter shall not apply to . . . Construction, reconstruction, operation or maintenance by an *authorized person* of overhead electrical or communication circuits or conductors and their supporting structures, or to electrical generating, transmission or distribution systems, or to communication systems

Rather than being "contractors," however, Bruderer and Parsons are employees of a communication services company and are therefore excluded from the scope of the Act. The "exemptions" portion of the Act states, in pertinent part:

I.C. § 55-2405(1) (emphasis added). In pertinent part, an "authorized person" means "[a]n employee of a cable television or communication services company or an employee of a contractor of a cable television or communication services company, if specifically authorized by the owner of the poles to make cable television or communication services attachments, while the employee is working within the scope of his employment." I.C. § 55-2401(1)(d). The Act fails to supply a definition for "specifically authorized," but it cannot require written notification resulting in mutually agreeable arrangements as described in Idaho Code § 55-2403(1), as the Defendant suggests. Such an interpretation

ORDER - 13

would mean that a communication services employee would only be exempted from the Act if the employee first complied with the notification requirements of the Act. Such an interpretation would make the exemption provision meaningless. Accordingly, the legislature must have intended something less formalistic, such as the type of coordinated effort between Orius and Utah Power & Light that occurred during the house-moving project.

Moreover, assuming the Act applied to Bruderer and Parsons, the indemnification provision cannot preclude the Defendant from liability for its own acts of negligence when the injured party is both a contractor and the "third person" for purposes of determining indemnification. The indemnification provision provides that:

> If a violation of the provisions of this chapter results in physical or electrical contact with any high voltage overhead line, the contractor committing the violation shall be liable to the public utility owning or operating the high voltage overhead line for all damages to the facilities and *all costs and expenses, including damages to third persons, incurred by the public utility as a result of the contact.*

I.C. § 55-2404(2) (emphasis added). When a term, such as "third persons," is not defined by the statute, it shall be given its plain, usual and ordinary meaning. *Purco Fleet Serv., Inc. v. Idaho State Dept. of Finance*, 140 Idaho 121, 124-25, 90 P.3d 346, 349-50 (2004). Therefore, the court turns to Black's Law Dictionary (8th ed. 2004), which defines a "third party" as "[a] person who is not a party to the lawsuit, agreement, or other transaction but who is . . . somehow implicated in it; someone other than the principal parties." Because Bruderer and Parsons are parties to this action, they cannot also be "third persons." Accordingly, Defendant's Motion For Summary Judgment based upon Idaho Code § 55-2401 et seq. is **DENIED.**

**III. Joint and Several Liability:**

Until 1987, the Idaho Supreme Court recognized the common law rule of joint and several liability, whereby "[e]ach tortfeasor whose negligence is a proximate cause of an

ORDER - 14

indivisible injury should remain individually liable for all compensable damages attributable to the injury . . . and when tortious acts of several parties concurrently cause an injury, each tortfeasor is liable for the whole of the damage." *Doe v. Cutter Biological Inc.*, 852 F. Supp. 909, 915 (D. Idaho 1994) (quoting *Tucker v. Union Oil Co.*, 100 Idaho 590, 600, 603 P.2d 156, 166 (1979)). However, in 1987, the Idaho legislature enacted Idaho Code § 6-803(3), which provides, in pertinent part, that "[t]he common law doctrine of joint and several liability is hereby limited to causes of action listed in subsection (5) of this section." Subsection (5) states:

> A party shall be jointly and severally liable for the fault of another person or entity or for payment of the proportionate share of another party where they were acting in concert or when a person was acting as an agent or servant of another party. As used in this section, "acting in concert" means pursuing a common plan or design which results in the commission of an intentional or reckless tortious act.

I.C. § 6-803(5).

Qwest was certainly not the agent or servant of PacifiCorp and even assuming Qwest's telephone lines were permissibly attached to PacifiCorp's guy pole under a 1970's pole sharing agreement, which neither party has produced, it is unclear how that might constitute a "common plan or design." Sharing utility poles and attaching utility lines in alleged violation of the NESC regulations hardly constitutes a "common plan or design," even if it did result in a "reckless tortious act." Therefore, the court **GRANTS** Defendant's Motion For Summary Judgment on the issue of joint and several liability.

**IV. Idaho's Workers' Compensation Statutes:**

This argument is **DENIED as moot** by reason of the court's granting Defendant's motion on the joint and several issue.

Accordingly, for the reasons provided herein, **IT IS HEREBY ORDERED:**

(1) Defendant's Motion For Summary Judgment on the issue of intervening, superseding causes is **DENIED.**

ORDER - 15

(2) Defendant's Motion For Summary Judgment concerning Idaho's Activities in Proximity to High Voltage Overhead Lines Act is **DENIED.**

(3) Defendant's Motion For Summary Judgment as to Plaintiffs' claims of joint and several liability is **GRANTED.**

(4) Defendant's Motion For Summary Judgment as to Idaho's Worker's Compensation Statutes is **DENIED as moot.**

**DATED** this 11th day of June 2007.

s/ Justin L. Quackenbush<br>
JUSTIN L. QUACKENBUSH<br>
SENIOR UNITED STATES DISTRICT JUDGE